UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PETER DEPPE, on behalf of himself and all others similarly situated, | ) ) ) | Case No:  1:16-cv-00528 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................................... 1

II.  PARTIES ................................................................................................................ 2

    A.  Plaintiff .......................................................................................................... 2

    B.  Defendant ...................................................................................................... 8

III.  JURISDICTION AND VENUE ............................................................................. 9

IV.  RELEVANT MARKET .......................................................................................... 9

V.  UNLAWFUL AGREEMENTS IN RESTRAINT OF TRADE OR COMMERCE IN NCAA DIVISION I FOOTBALL ................................................................... 15

    A.  Caps on the Number of Division I Football Scholarships .................... 16

    B.  Restrictions on Players' Ability to Transfer ........................................ 17

VI.  INJURY TO PLAINTIFF AND CLASS MEMBERS ....................................... 24

VII.  CLASS ALLEGATIONS ..................................................................................... 25

VIII.  CAUSES OF ACTION ......................................................................................... 28

FIRST CAUSE OF ACTION  VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) ............................................................................................. 28

SECOND CAUSE OF ACTION  VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1) ............................................................................................. 29

PRAYER FOR RELIEF .................................................................................................. 30

JURY TRIAL DEMANDED ........................................................................................... 31

Plaintiff, by and through his attorneys, based on his individual experiences, the investigation of counsel, and upon information and belief, alleges as follows:

## I.      INTRODUCTION

1.      This suit challenges the National Collegiate Athletic Association ("NCAA") rules capping the number of football scholarships a Division I football team may award.  These rules are horizontal restraints intended to reduce the cost of essential inputs in the production of high quality Division I football games.

2.      By unlawfully agreeing to limit the number of Division I football scholarships that a member institution can grant in any given year, the NCAA and its member institutions have ensured that student-athletes in the Class receive tens of millions less for their labor for member institutions than they would receive – and the member institutions would pay – in a competitive market.

3.      Plaintiff also challenges the NCAA's rules that prevent Division I football players from transferring to other NCAA Division I schools without losing athletics eligibility for a year. The NCAA's limitation on the mobility of college athletes is patently unlawful.  For a striking contrast, one can simply examine the unfettered mobility of the players' coaches.  Football coaches, including assistant coaches, are free to leave a school at any time they choose to take another job in the college or professional football ranks.  This ability to better their own situation has allowed coaches to reap enormous financial benefits.  At least 34 Division I head football coaches now earn more than $3 million per year, even prior to the calculation of what can often

be performance bonuses in excess of $1 million.[1]  At least 37 Division *assistant* coaches earn

more than $600,000 per year, prior to the calculation of performance bonuses.[2]

4.    Players, however, suffer a severe penalty for transferring – the loss of a year of

athletics eligibility.  This can make them a very unattractive option for coaches who are under

constant "win now" pressure.  The NCAA's transfer rules restrain players' ability to make the

best choices for themselves, including ones based on financial considerations, academic

considerations, athletics considerations, and personal circumstances.  The NCAA's transfer rules

are anticompetitive and violate the Sherman Act.

## II.    PARTIES

**A.    Plaintiff**

5.    Peter Deppe is a citizen of the United States and a resident of Illinois.  He was a

skilled football punter in high school, a "[f]our-time all-area and all-conference honoree as a

kicker and a punter," who "[e]arned all-state recognition as a senior after converting 36-of-40

PATs," "[p]osted an average of 44.0 yards per punt in 2013," "[a]veraged 40.0 yards per punt as

a junior, including a long of 60 yards," "[c]onverted on 34-of-42 PATs and posted 12 touchbacks

on kickoffs in 2012," and "[r]anked the seventh-best punter in the nation at the Kohl's Kicking

Camp."[3]  Mr. Deppe was also captain of the football team, was ranked academically number 12

of 113 students, graduated with a 3.9 grade point average on a 4.0 scale, was a National Honor

Society Member, participated in the school band as a trumpet player, and was a robotics team

captain.

---

[1] http://sports.usatoday.com/ncaa/salaries/ (last visited Nov. 3, 2015).

[2] http://sports.usatoday.com/ncaa/salaries/football/assistant (last visited Nov. 3, 2015).

[3] http://www.niuhuskies.com/sports/m-footbl/mtt/peter_deppe_884593.html (last visited Feb. 26, 2016).

6.      NCAA Division I football is divided into two subdivisions, Division I-A, now known as FBS (Football Bowl Subdivision), and Division I-AA, now known as FCS (Football Championship Subdivision).  Numerous FBS teams recruited Mr. Deppe while he was in high school, including but not limited to Northern Illinois University (recruited as a preferred walk-on), Central Michigan University (recruited as a preferred walk-on), Michigan State University (was in top 2 prospects for scholarship offer), Northwestern University (recruited as a preferred walk-on), Iowa State University (was in top 2 prospects for scholarship offer), University of Toledo (offered a scholarship), University of Minnesota (preferred walk-on). Mr. Deppe was also recruited by FCS schools Harvard University and Princeton University, as well as Division II's Saginaw Valley State University (offered a scholarship).  Mr. Deppe was considered to be in the top two or three punters for each school.

7.      In January of 2014, while still enrolled in high school, Mr. Deppe took an "official visit" (an NCAA-defined term) to Northern Illinois University ("NIU") in DeKalb, Illinois.  This "official visit" thus designated Mr. Deppe as a "recruited" (another NCAA specifically defined term) athlete under NCAA rules, thus making him subject to the NCAA's transfer rules challenged herein.

8.      In February of 2014, an NIU coach visited Mr. Deppe to further express NIU's interest in him.  Mr. Deppe ultimately chose to attend NIU.  He enrolled at the university in June 2014 as a preferred walk-on student-athlete.

9.      Mr. Deppe chose to attend NIU because of the opportunity to red shirt for the first season and take over as the starting punter on scholarship for a team that consistently went to their conference championship as well as earning his Mechanical Engineering degree.

10.     Mr. Deppe was asked Special Teams Coach Kevin Kane and Head Coach Rod Carey to be a starting player for the 2014 season, but decided, with the consent and support of the coaching staff, that it would be beneficial to be designated as a "redshirt" (an NCAA-defined term) player for the year, so that he would have additional time to grow and mature as a player and have an additional year of athletic eligibility.  He was then officially designated a redshirt for the 2014 season, meaning that he could not and did not play in any game that season, but would still have a full four years of athletics eligibility beginning with the 2015 season.

11.     In August 2014, due to Mr. Deppe's performance in practices, NIU's special teams coach told him that he would begin receiving an athletic scholarship in January of 2015. But the special teams coach subsequently left NIU to accept a coaching position at the University of Kansas.  Mr. Deppe then was informed Head Coach Rod Carey that he would not be receiving the athletic scholarship.

12.     Mr. Deppe continued to practice with the team through August 17, 2015. However, NIU signed another punter, which significantly reduced Mr. Deppe's prospects for achieving playing time in the future or for obtaining the previously-withdrawn scholarship offer.

13.     Mr. Deppe thus obtained official letters of release from NIU in September 2015 to allow him to begin the recruiting process with other schools.

14.     On October 10, 2015, Mr. Deppe took a recruiting visit to the University of Iowa ("Iowa"), a member of the NCAA's Division I FBS and the Big Ten Conference.  At that time, Iowa's coaching staff told Mr. Deppe that they wanted him on the team if he would be eligible to play in the Fall of 2016, and wanted him to enroll in January of 2016.

15.     One of the NCAA's primary justifications for the transfer rules at issue in this case, as further discussed herein, is that the rules somehow assist players academically and

allows them time to acclimate to a new school.  However, at the time that Mr. Deppe was being

recruited by Iowa, his GPA at NIU was 3.1 on a 4.0 scale, and he was majoring in mechanical

engineering while juggling the time demands of participating on the football team.  In high

school, he had demonstrated academic and athletic excellence and an ability to successfully

juggle multiple time commitments.

16.    Mr. Deppe was not concerned about acclimating to Iowa, because he had more

family connections in Iowa than in Illinois.  Mr. Deppe's parents are from Iowa and his

grandparents currently reside in Dubuque, Iowa and Walcott, Iowa.

17.    In September 2015, Mr. Deppe's parents contacted the NCAA regarding whether

Mr. Deppe would be eligible to play in the Fall of 2016.  The NCAA indicated that, because Mr.

Deppe sought to transfer from one FBS school to another FBS school, NCAA rules mandated

that he would be ineligible for athletic competition for one year, and could not participate until

the 2017 season.

18.    On November 11, 2015, Mr. Deppe's counsel at the law firm of Hagens Berman

Sobol Shapiro LLP (co-counsel in this case and related litigation in this Court) contacted the

NCAA via letter, detailing Mr. Deppe's circumstances, including his academic credentials, and

requested relief from the NCAA's transfer rules.  In particular, counsel wrote:

> [Mr. Deppe]'s situation . . . perfectly illustrates the unfair effects
> of the transfer rules. . . .  He is urgently in need of relief from
> application of the transfer rules.  As you will see in the attached
> information sheet, strictly applying the transfer rules to Peter
> makes absolutely no sense.
>
> He was a non-scholarship player at NIU.  An assistant coach who
> had promised him a scholarship left the team, and the head coach
> did not honor the assistant coach's commitment.  Peter is an
> excellent student, a Mechanical Engineering major with a 3.1

GPA.  His family is from Iowa, and he has more family connections there than in Illinois.

The University of Iowa wants him to play on their team, but they have an immediate need for a punter for the 2016 season.  If Peter is not eligible to play, Iowa has made it clear that it will need to move on from Peter and pursue another player. . . .

Peter's academic application to the University of Iowa has been submitted and is currently being evaluated for the purpose of starting classes in January 2016.  By approving the waiver to play in the 2016 football season by November 25, 2015, Peter can enroll in classes at Iowa, make arrangements for housing and become a member of the Iowa football team for spring 2016 practices.

Peter, Peter's parents, and I all ask the NCAA here to please demonstrate compassion and do the right thing for Peter.  Time is of the essence.

19.      On November 13, 2015, the NCAA responded via letter, indicating that it "could not find a record of a waiver application of behalf of Mr. Deppe by the transfer institution" and that "[t]he waiver process is initiated by an institution to which a student is transferring and submitted to the NCAA Academic and Membership Affairs for staff and member committee review."

20.      However, when Mr. Deppe's parents had initially contacted the NCAA in September 2015, the NCAA did not contend that a prospective new school needed to submit a waiver request.

21.      On or about November 16, 2015, the University of Iowa granted admission to Mr. Deppe for academic purposes.

22.      On or about November 19, 2015, Iowa informed Mr. Deppe that it had decided to go in a different direction and pursue another punter who had immediate eligibility and would not be pursuing a waiver.

23.     On December 6, 2015, Mr. Deppe's counsel again wrote to the NCAA, informing them of Iowa's position, again requesting a waiver, and stating:

> It has become apparent that this is a "chicken or the egg" scenario, meaning, without a waiver in hand from the NCAA, Mr. Deppe is far less of an attractive prospect to a new school. When schools are under tight time constraints to try to fill immediate needs, it appears that any obstacle to obtaining a potential new player operates to the detriment of that player. Here, Iowa decided to go in another direction rather than initiate a process with the NCAA.
>
> What will serve the best interests of Mr. Deppe is to have a waiver in hand from the NCAA as soon as possible. Will the NCAA agree to review Mr. Deppe's circumstances, including as outlined in my November 10th letter? We believe that it simply makes no sense to allow the transfer rules to block him from pursuing academic and athletic opportunities at a new school. But absent expedited action from the NCAA, Mr. Deppe will have lost the chance to pursue those opportunities.
>
> Peter, Peter's parents, and I all again ask the NCAA here to please demonstrate compassion and assist Peter.

24.     On or about December 11, 2015, the NCAA responded in writing, stating:

> The NCAA Division I Committee for Legislative Relief maintains authority for providing legislative relief waivers of NCAA rules, including transfer rules, upon request from a member institution or conference . . . any member institution has the opportunity to file a request for a waiver of the general transfer rule for any student-athlete who does not satisfy a legislated exception to the general rule. . . .
>
> Without such a request being made by a member school, there is no ability for the NCAA national office to provide a waiver for membership adopted rules.

25.     Other Division I FBS schools besides Iowa had also expressed interested in Mr. Deppe, but it was apparent that without a guarantee that Mr. Deppe would be immediately eligible to play, the schools would need to move on to other players, and they did so.

- 7 -

**B.      Defendant**

26.      Defendant NCAA is an unincorporated association that acts as the governing body of college sports.  Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports.  The NCAA Constitution and Bylaws were adopted by votes of the member institutions and may be amended by votes of the member institutions.  Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its members and between members of the NCAA.

27.      The NCAA includes 1,102 active member schools, and these schools are organized into three Divisions.  Division I includes 348 schools, including 242 with extensive football programs.  Divisions II and III include schools with much less extensive or no football programs.

28.      As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular levels of college football must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members.  There is no practical alternative to Division I NCAA membership for any academic institution that wishes to participate at the highest levels of college football.  Indicative of the NCAA's market power, when the NCAA bans a university from participating in NCAA-sponsored collegiate competition, this prohibition is colloquially known as the "death penalty."

29.      Because the NCAA and NCAA member institutions control the highest and most popular levels of college football, any individual who wishes to provide athletic services in exchange for the payment of *full* tuition for an undergraduate academic and athletic education

- 8 -

must by necessity attend an NCAA Division I member institution.  There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA football schools:  (i) the ability to exchange athletics services for the payment of the full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best be able to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, and (vi) competition at the highest level of amateur football.

30.    There is no major college football program in the United States that is not an NCAA Division I member, abiding by the NCAA rules.  Division I NCAA member institutions are by far the largest purchasers of student football labor in the United States, and the NCAA and its Division I member institutions have monopsony power over the market for student football players.

### III.    JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4 and 15 and 29 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust laws.

32.    This Court has personal jurisdiction over the Defendant because its headquarters are located in this district and it transacts business in this district, including, but not limited to, sporting events.  Furthermore, NCAA member institutions and co-conspirators are located in this district.

### IV.    RELEVANT MARKET

33.    The relevant market is the nationwide market for the labor of Division I football student-athletes.  In this labor market, student-athletes compete for spots on Division I football

athletic teams of NCAA member institutions, and NCAA member institutions compete for the best Division I football collegiate student-athletes by paying in-kind benefits, namely, Division I football scholarships, academic programs, access to training facilities, and instruction from premier coaches.

34.     NCAA Division I football is further divided into two subdivisions, Division I-A, now known as FBS (Football Bowl Subdivision), and Division I-AA, now known as FCS (Football Championship Subdivision).  These subdivisions constitute distinct submarkets within the broader labor market for Division I football student-athletes.

35.     NCAA rules currently permit the award of 85 full scholarships for FBS teams, and 63 full scholarships for FCS teams.

36.     Division I football programs compete at the highest level of the college sport. They generate billions of dollars in revenue from attendance fees, TV contracts, sponsorship, and alumni contributions.

37.     The superior revenues generated by Division I football programs enable FBS and FCS schools to provide superior coaching, playing and training facilities, and travel opportunities to football players.

38.     NCAA Division II football programs are not in the same market as Division I football programs.

39.     The total number of Division II scholarships is limited to 36.  A typical NCAA college football squad numbers 100 players.  So, almost no Division II football athletes are awarded a full scholarship.

40.     Division II football programs have smaller budgets, play close to home, and do not generate excess revenue for the school as a whole.

41.     NCAA Division III football programs are prohibited from awarding athletic scholarships so they are not in the relevant market.

42.     The NAIA is the only other association sponsoring college football.  It is made up of smaller schools, and NAIA rules permit only 24 scholarships.  So, almost no student-athlete receives a full scholarship to play football.  NAIA football programs are also not in the relevant market.

43.     Two-year junior colleges cannot award college degrees.  Superior high school football players do not choose to play at a junior college unless they are unable to meet NCAA academic eligibility standards.

44.     The differences between the NCAA divisions, and between the NCAA and the NAIA, are demonstrated by a variety of additional factors.

45.     Total football revenue is probably the most critical factor in differentiating the market.  Total football revenue for the 242 Division I schools in 2011 was well over $3 billion, with the majority coming from the 120 FBS schools ($2,956,499,371).  Total football revenue for the 122 FCS schools was $375,774,921 in 2011.

46.     In contrast, total football revenue for the 157 Division II football schools was less than half of the FCS revenue ($181,929,450).

47.     Football revenue for *all* NAIA schools was $83.6 million.

48.     For 2011, average football team revenue for FBS schools was $24.6 million.  Average term revenue for FCS schools was $3.1 million.  Average football team revenue for Division II schools was $1.2 million.  Average football revenue for NAIA schools was even less, approximately $1.0 million.

49.     The large differences in revenue between Division I schools and NAIA and Division II schools are driven in part by the differences in total attendance.

50.     In 2012, FBS schools had a total attendance of 37,170,235; FCS schools had an attendance of 5,967,272 fans, and *all* 157 Division II football teams drew 3,006,297.  Total 2011 attendance figures for the 81 NAIA football schools were not available but the number is insignificant when compared to NCAA Division I attendance figures.

51.     Average attendance figures also differentiate the relevant market.  In 2012, FBS schools averaged 45,440 per game.  FCS schools averaged 9,041 per game.  Division II football averaged 3,520 per game.

52.     NAIA schools play in much smaller stadiums.  Marion University, an NAIA school, has a stadium with a maximum capacity of 3,000.  Several Division I football schools compete in stadiums with a capacity in excess of 100,000.

53.     The differences between college football divisions in the quality of competition and the level of institutional support cause superior high school football players to choose Division I scholarships over Division II or NAIA scholarships.  For these players Division II and NAIA football is not a substitute for Division I football.

54.     The intense recruitment of talented high school football players has led to the growth of companies which scout and rate thousands of players.  The most prominent company, rivals.com, rates high school players on a 0 to 5 star scale.  Of the 21,198 athletes tracked by rivals.com between 2007-2011 that received a Division I scholarship offers, fully 90% accepted. The vast majority of the other 10% opted out of college football rather than accept a scholarship at a Division II or NAIA school.  Again, this indicates that Division II and/or NAIA football is not an adequate substitute.

55.     The submarket of FCS football is also its own relevant labor market for talented high school players.

56.     FCS schools regularly play against FBS schools.  FCS games are regularly televised on national TV channels.  Yet, if given a choice between an FBS scholarship and an FCS scholarship, 85% of the high school players tracked by rivals.com between 2007 and 2011 chose the FBS scholarship, and 5% chose the FCS scholarship.  (The other 10% did not play college football.)

57.     The relevant market is illustrated by the experience of Plaintiff Deppe.  Mr. Deppe was recruited by FBS schools and, after starting at NIU, received a full scholarship offer, which was later retracted.  After a new coach withdrew his scholarship and recruited another punter to the team, Mr. Deppe sought to transfer to another FBS school.  Iowa then recruited Mr. Deppe, so long as he would be eligible to start in the fall of the following year.  However, the NCAA denied Mr. Deppe's multiple requests for a waiver of the requirement that he sit out of athletics for one year upon transfer.  Accordingly, Iowa withdrew its offer and recruited another punter in Mr. Deppe's place.

58.     But for the NCAA restrictions on the number of football scholarships Division I schools may award, Mr. Deppe would have had a scholarship at NIU and would have had more schools to choose to play for, including FBS and FCS teams.

59.     But for the NCAA restrictions on athletic eligibility upon transfer, Mr. Deppe would have been eligible to play for and would have played for Iowa, and would have received additional offers from FBS teams.

60.     The relevant geographic market is the United States.  All Division I football teams are located in the U.S.  As a uniquely American sport, 99.9% of all Division I football players are from the United States.

61.     Despite the nonprofit status of NCAA member schools, the transactions those schools make with premier Division I football athletes – full scholarships in exchange for athletic services – are not noncommercial, since schools make millions of dollars annually as a result of these transactions.

62.     Thus, the transactions between NCAA schools and student-athletes are, to some degree, commercial in nature, and therefore take place in a relevant market with respect to the Sherman Act.

63.     Given the competition for Division I football athletes, the only reason that NCAA Division I schools do not engage in price competition is due to the fact the Bylaws at issue prevent them from doing so.

64.     Colleges do, in fact, compete for student-athletes, though the price they pay involves in-kind benefits as opposed to cash.  For instance, colleges may compete to hire the coach that will be best able to launch players from the NCAA to the National Football League, an attractive component for a prospective college football player.  Colleges also engage in veritable arms races to provide top-of-the-line training facilities which, in turn, are supposed to attract collegiate athletes.  Many future student-athletes also look to the strength of a college's academic programs in deciding where to attend.  These are all part of the competitive market to attract student-athletes whose athletic labor can result in many benefits for a college, including economic gain.

65.     Schools spend significant sums and time recruiting highly skilled Division I athletes.  The University of Tennessee's football team spent nearly $1.5 million on its 2011 recruiting class.

66.     Institutions have also begun to recruit Division I football athletes earlier and earlier in their careers.  Recent reports have detailed college scholarships being offered to kids as young as 14 years old – before they even begin high school.  Examples of costs undertaken by NCAA member institutions to gain access to young athletes and their families include:  travel expenses, letters, phone calls, on-campus visits, and the use of recruiting services.

67.     The NCAA prohibits its member institutions from simply paying student-athletes salaries.  Instead, students with athletic ability often are given Division I football scholarships that may sometimes equal the yearly cost of their education.  In effect, the student-athlete uses his or her athletic abilities on behalf of the NCAA member institution in exchange for the cost of an athletic and academic education, room, and board.  NCAA member institutions pay for these goods and services for student-athletes because student-athletes bring substantial collateral benefits to the school in the form of:  (a) enhanced publicity and recruiting, which increases overall tuition revenue, (b) increased alumni donations, and (c) millions of dollars in gate receipts and licensing revenue.

**V.     UNLAWFUL AGREEMENTS IN RESTRAINT OF TRADE OR COMMERCE IN NCAA DIVISION I FOOTBALL**

68.     The NCAA is an association of member institutions that compete against each other to attract revenue, fans, and athletes.  It operates as a cartel to control nearly all aspects of college football.

69.     The specific practices challenged here are:  (i) the NCAA's unlawful caps on the number of football Division I football scholarships that can be awarded by Division I member

institutions, and (ii) the NCAA's transfer rules that prohibit a Division I football player from transferring to another NCAA Division I school without loss of athletic eligibility for a period of time.

70.     The restrictions outlined below represent unlawful agreements not to compete in terms of price or output and constitute a naked restraint of trade and commerce.

71.     The restrictions outlined below are inconsistent with the Sherman Act's command that price and supply be responsive to consumer preference.

**A.     Caps on the Number of Division I Football Scholarships**

72.     The NCAA imposes highly restrictive caps on the total number of Division I football scholarships that can be granted to student-athletes.  Specifically, the NCAA limits the number of football scholarships that a school can grant each year.  The precise number varies by subdivision.

73.     For the sport of football, the NCAA prohibits Division I FBS schools from providing Division I football scholarships to more than 85 student-athletes.  FCS schools may not award more than 63 full scholarships.

74.     The NCAA's rules regarding the number of Division I football scholarships that can be awarded to student-athletes cannot be justified by amateurism concerns.  Lifting limitations on the number of Division I football scholarships that can be offered to student-athletes would have absolutely no effect on amateurism because student-athletes would continue to receive no wages for their playing.

75.     Nor can the NCAA's current restrictions on the number of football scholarships be justified by competitive balance concerns.  The NCAA's rules actually permit the *most* competitive schools to have *more* scholarships, which is the opposite of what would be expected

if the NCAA's true concern were maintaining competitive balance.  These Bylaws – one-year limit to scholarships and a limit on scholarships per team – are not inherently or obviously necessary for the preservation of amateurism, the student-athlete, or the general product of college football.  Issuing more scholarships (thus creating more amateur players) and issuing longer scholarships cannot be said to have an obviously negative impact on amateurism.

76.    In short, the NCAA's rules capping the duration and number of Division I football scholarships have nothing whatsoever to do with maintaining competitive balance.

77.    But even if they did, "competitive balance" is not a valid pro-competitive justification for restraining price competition among NCAA member institutions for student-athlete labor because numerous methods exist – such as restricting alumni donations or recruiting budgets – by which competitive balance could be maintained without fixing the price of student-athlete labor.

78.    Moreover, any minimal effect on competitive balance is vastly outweighed by anticompetitive effects of the NCAA's caps on the number of Division I football scholarships because the restrictions result in dramatically higher prices for class members and eliminate price competition between schools for the labor of the student-athletes.  Consequently, antitrust laws require that the NCAA ensure competitive balance without restraining price competition among NCAA member institutions for student-athletes' labor.

**B.     Restrictions on Players' Ability to Transfer**

79.    The NCAA's rules provide that if a student-athlete at a four-year Division I institution wishes to transfer to a different four-year Division I institution, he must sit out from intercollegiate competition for one academic year while the clock on his five-year window of eligibility continues to run.  NCAA Bylaw 14.5.5.1 states:  "**General Rule.** A transfer student

from a four-year institution shall not be eligible for intercollegiate competition at a member institution until the student has fulfilled a residence requirement of one full academic year (two full semesters or three full quarters) at the certifying institution.  (Revised: 1/10/91 effective 8/1/91, 4/14/10)."

80.     Certain limited exceptions exist to the year-in-residence requirement, including a so-called one-time transfer exception.  That exception, however, is not available to Division I football players unless the player is transferring from an FBS school to an FCS school and has two or more seasons of competition remaining, or the player is transferring from an FCS school that offers athletically-related financial aid in football to an FCS school that does not.  Nor may a student-athlete be granted a one-time transfer exception unless the school from which he is transferring consents to it in writing.  *See* NCAA Bylaw 14.5.5.2.10.

81.     A waiver process is available to Division I football players and other student-athletes not eligible for the one-time transfer exception, pursuant to which students who transfer due to difficult personal or family circumstances may be provided with an additional year to complete their eligibility.  Prior to the 2015-16 academic year, these student-athletes could seek a waiver to play immediately after transfer.  But even if they met the stringent requirements for eligibility, the procedure required extensive documentation and was criticized for its inconsistent approval process.

82.     Numerous college sports commentators have criticized the Byzantine nature of the transfer rules.  The sheer complexity of them serve as an impediment and barrier to players' consideration of transferring schools, further entrenching the NCAA's anticompetitive effects in the relevant market.  For example, in 2013, ESPN.com's Eamonn Brennan wrote an article titled

"Want to Understand Transfer Rules? Give Up."[4]  He wrote:  "Transfers seem straightforward. A player leaves one school and attends another, and has to sit out one year before he can play for his new team.  Simple, right?  Wrong: Even that seemingly structured rule is beset by a score of academic timeline requirements and bureaucratic processes."  Mr. Brennan described those requirements as follows:

> A player must receive a written permission-to-contact letter from his current coach.  He must have spent a full year in "academic residence" -- i.e., attending classes as a full-time, 12-credit-hours-or-insert-your-school's-equivalency student -- before he is eligible to get back on the court at his new school.  There are "4-4" transfers and "2-4" transfers and different rules therein; there are issues involving full, partial, or non-qualifying academic status; and there are waivers and appeals you can make based on specific circumstances that can change the preexisting requirements, just like that.

83.     The NCAA each year publishes a document titled "Transfer 101" which purports to be a guide to help players understand the transfer process.  It in fact is a 30-page, single-spaced document of which Mr. Brennan writes:  "Ostensibly, this document was created to make the rules easy to understand and apply.  It is filled with handy little case studies; it even has a glossary of important terms.  And if you can read past the third page without help from prescription ADHD medication, well, I'd love to shake your hand.  This stuff is *brutal*."

84.     Recently, the NCAA eliminated the ability of Division I football players to apply for a waiver to play immediately.  Under the new rule, transferring Division I football players who would have been eligible for such a waiver will instead receive a sixth year of eligibility to play.

---

[4] http://espn.go.com/blog/collegebasketballnation/post/_/id/87697/trying-to-understand-transfer-rules-give-up (last visited Mar. 2, 2016).

85.    With the change in the rule, only the small percentage of Division I football players who fulfill the requirements for the one-time transfer exception (or other enumerated exceptions in the NCAA rules) and manage to secure permission from their original schools can play immediately upon transfer.  All other transferring players are forced to sit out from competition for a year while the five-year clock on their window of eligibility continues to run.

86.    The year-in-residence requirement functions as a penalty imposed upon Division I football players for switching schools.  Without the ability to play immediately, transferring student-athletes are less attractive prospects and therefore less likely to secure athletic grants-in-aid from their new schools.  The inability to receive an athletics grant-in-aid is particularly egregious in the case of student-athletes, like Plaintiff, who are forced to transfer because of a retracted athletics grant-in-aid at their original school and replacement by another player.  Those without any other financial means available to them may be forced to give up their dreams of competition at the highest levels and instead transfer to a Division II school, or they may have to drop out of school entirely.  Thus, as a result of the year-in-residence requirement, class members receive lower amounts of athletics-related financial assistance and other direct compensation than they would receive if class members were permitted to transfer without this limitation.

87.    But for this restraint, greater movement among Division I football players would inevitably occur.  Players would seek out the team they most value, whether because of more playing time, a better relationship with the coaching staff, a change in the coaching staff that recruited the player, a better academic fit, or the availability of an athletics grant-in-aid on more favorable terms.  Teams, in turn, would also seek out the players they most value.  Free player movement would thus result in an optimal and most efficient matching of schools and players.

88.     Through the year-in-residence requirement, the NCAA and its members have thus contracted, combined and conspired to restrict the movement of players between schools in the relevant market, as well as remove some players from the market altogether.

89.     Through the year-in-residence requirement, the NCAA and its members have further contracted, combined and conspired to fix, depress or stabilize the amount, terms and conditions of athletics-based financial assistance to class members in the relevant market.

90.     The NCAA cannot justify its conduct as necessary to preserve education or amateurism.  The NCAA has claimed that the year-in-residence requirement exists to "help student-athletes adjust to their new school" and "help[] offset th[e] dynamic" of poor academic performance by transferring student-athletes over time.[5]  The NCAA also currently states on its website that "[i]n most cases, you may not compete for one year after transferring from a four-year college to another four-year college.  This year is an opportunity to adjust to your new school and focus on your studies rather than sports."[6]

91.     But Division I football players are ineligible for a one-time exception to the year-in-residence requirement regardless of academic performance, even though the NCAA admits that "student-athletes who transfer with at least a 2.6 grade-point average have the same likelihood of academic success as a student-athlete who remains at his or her original institution."[7]

---

[5] NCAA, *Get the facts about transfers*, May 30, 2012, http://www.ncaa.org/about/resources/media-center/news/get-facts-about-transfers (last visited Mar. 2, 2016).

[6] NCAA, *Want to transfer?*, http://www.ncaa.org/student-athletes/current/want-transfer (last visited Mar. 2, 2016) (*see* "When Can I Compete?" questionnaire text).

[7] NCAA, *Get the facts about transfers*, May 30, 2012.

92.     Moreover, it has been decades since the NCAA maintained a rule making freshmen ineligible for athletic competition.  Freshmen are less equipped for college academics than are transfer students, who have experienced some college academics, perhaps several years.  And yet freshmen are immediately eligible to play, but transferring players are not.  Similarly, transfers from junior colleges are not required to sit out a year, having had no exposure to a four-year university's more rigorous academic demands.

93.     The NCAA's proffered academic motivations for the year-in-residence requirement are instead a pretext for the true economic motivations behind the rule.  Such motivations are seen most clearly via the one-time transfer exception, which is not available to the vast majority of Division I football players, as well as to Division I basketball and baseball players and men's ice hockey players.  The NCAA claims that these sports are "historically academically underperforming,"[8] but as stated above, players in these sports are ineligible for the one-time transfer exception regardless of academic performance.  Rather, these sports also happen to be the highest-revenue sports.  The transfer rules at issue further NCAA members' economic interests in maintaining athletic programs while minimizing financial expenditures related to athletes.  The transfer rules allow schools to lock-in players for significant time periods, while minimizing administrative costs related to player movement, including recruiting and retention expenditures.

94.     Defendants' restraint is also further at odds with their often-professed legal defense of "competitive balance."  The restraint preserves the hegemony of the top "Power 5" conferences, the most powerful members of the NCAA, who are able to recruit the most highly

---

[8] *Id.*

coveted high school prospects in the country.  By locking-in those players, the transfer rules prevent player movement to less-powerful schools and conferences.  Thus, a player may languish at a Power 5 conference school, unable to obtain the playing time promised in the recruiting process, instead of flourishing and developing at a smaller school, to the benefit of the player and fans alike.  Such circumstances would severely threaten the perception of the Power 5 conferences as the ultimate and best destination for high school players.

95.     Defendants' restraint in suit, severely limiting player choice and mobility, is designed simply to further subjugate the rights of college players.  The restraint is at odds with the interests of fans of FBS football, as it limits and restrains the availability of players to schools for which the players may be a better athletic fit, and for which the players may help produce a better product for fans.

96.     As noted in the Introduction to this Complaint, the restraints on player movement are in stark contrast to the increasing frequency with which head coaches, assistant coaches, and athletic directors switch schools in search of higher paydays.  There are no such limitations on their movement, and many such circumstances have been heavily publicized.

97.      Numerous commentators and participants in the college sports industry have illustrated, sometimes very bluntly, the lack of any legitimate justifications for the NCAA's transfer prohibition rules.  For example, on April 21, 2015, CBS Sports.com's Gary Parrish wrote in regards to the rule as applied to basketball players that "The point I'd rather make today is one I think we can all agree on, and that's how there's a pretty terrible unintended consequence to the NCAA no longer allowing waivers for transfers to play immediately, and that pretty terrible unintended consequence is this:  Players who are run off by their coaches are now basically screwed."  Parrish continued:  "'It's wrong,' said one college coach who requested

anonymity because he didn't want to speak out publicly against policy. 'You're telling me I can sign a kid, keep him for a year or two, decide I misevaluated him and pull his scholarship, and then that kid has to sit a year no matter what? That's [expletive] up, man. That's just [expletive] up.'"

## VI.  INJURY TO PLAINTIFF AND CLASS MEMBERS

98.     In a competitive market, Plaintiff would have initially received a multi-year grant-in-aid offer at an FBS school for the true Cost of Attendance. Plaintiff was injured by the NCAA's artificial and anticompetitive caps on the number of athletic grants-in-aid.

99.     In a competitive market, Plaintiff would have received additional grant-in-aid offers from Division I schools. Plaintiff was deprived of these choices by the NCAA's artificial and anticompetitive restrictions on the number of grants-in-aid that NCAA member institutions are permitted to offer. The NCAA's wholly artificial caps on the number and distribution of Division I football grants-in-aid reduces the overall supply of football grants-in-aid available to student-athletes, thereby forcing them to accept far less compensation than they would have received for their labor. Despite the billions of dollars in revenue generated by Division I football programs, the NCAA rules artificially restrict football grants-in-aid.

100.     In a competitive market, Plaintiff would have been able to transfer without limitation and, as a result, would have had several Division I full grant-in-aid offers and/or offers to play from which to choose. The NCAA's artificial and anticompetitive anti-transfer rules, pursuant to which a Division I football player must sit out of competition on his five-year clock unless he fulfills the very narrow and stringent requirements for a hardship waiver, has injured thousands of student-athletes by causing them to either lose an opportunity to transfer schools or give up a year of play. Division I football players who have lost grants-in-aid or their playing

time at their current schools are further faced with the decision to transfer to a Division I school

where they are unlikely to receive full grants-in-aid, if any aid at all, or transfer to a less

competitive Division II school.

## VII.    CLASS ALLEGATIONS

101.    Local Rule 23-1 provides that a party seeking to maintain a class must include in

the complaint "a reference to each part of Fed. R. Civ. P. 23 that the party relies on in seeking to

maintain the case as a class action."  Plaintiff complies with this rule in this Section VII.

102.    Plaintiff sues on his own behalf and on behalf of the following two classes,

including the following "Injunctive Relief Class" pursuant to Rule 23(a) and (b)(2):

> All individuals who, from November 4, 2011 to the present, have been a member
> of an NCAA Division I football team;

and the following "Transfer Core Issues Class" pursuant to Rule 23(a), (b)(3), and (c)(4):

> All individuals who, from November 4, 2011 to the present, have sought to
> transfer from one NCAA Division I football school to another NCAA Division I
> football school, and pursuant to NCAA transfer rules, were considered to be, or
> would have been considered to be, athletically ineligible to participate in NCAA
> Division I football for any period of time.

103.    Excluded from all proposed Classes are the employees of the NCAA and their

member institutions, employees, class counsel and their employees, and the judicial officers and

associated court staff assigned to this case.  Excluded from the proposed "Core Issues Class" are

individuals whose athletics-related grants-in-aid were reduced, cancelled or not renewed due to

one of the reasons enumerated in Bylaw 15.3.4.2 of the NCAA Division I Manual.

104.    Members in the Classes are collectively referred to as "class members" or "the

Class" unless otherwise specified.

105.    The persons in the Class are so numerous that individual joinder of all members is

impracticable under the circumstances of this case.  Although the precise number of such persons

is unknown, the exact size of the Class is easily ascertainable, as each class member can be identified by using Defendant's records.  Plaintiff is informed and believes that there are many thousands of Class members in satisfaction of Rule 23(a)(1).

106.    Pursuant to Rule 23(a)(2) and (b)(3), there are common questions of law and fact specific to the Class that predominates over any questions affecting individual members, including:

a.    Whether the NCAA and its member institutions unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing to limit the number of Division I football scholarships available to students;

b.    Whether the NCAA and its member institutions unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing to restrict NCAA Division I football players' ability to transfer to other NCAA Division I football schools without being deemed athletically ineligible for a period of time;

c.    The definition of the relevant market;

d.    Whether the NCAA has any pro-competitive justification for its conduct;

e.    Whether the pro-competitive effects of the conduct, if any, outweigh the clear injury to class members;

f.    Whether class members have suffered antitrust injury; and

g.    The nature and scope of injunctive relief necessary to restore a competitive market.

107.    Pursuant to Rule 23(a)(3), Plaintiff's claims are typical of the Class claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

108.    Plaintiff will fairly and adequately protect the interests of the Class in satisfaction of Rule 23(a)(4).  He will vigorously pursue the claims and has no antagonistic conflicts. Plaintiff has retained counsel who are able and experienced class action litigators and are familiar with the NCAA.

109.    Rule 23(b)(2) is satisfied, because Defendant has acted or refused to act on grounds that apply generally to the Class, and final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.  A class action is also appropriate because Defendant has acted and refuses to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

110.    Pursuant to Rule 23(b)(3), questions of law or fact common to class members predominate over any questions affecting only individual members.  Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendant.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendant and substantially impede or impair the ability of class members to pursue their claims.  It is not anticipated that there would be difficulties in managing this case as a class action.

## VIII.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

## (Applicable to Plaintiff's Claims Regarding the NCAA's Cap on Athletic Scholarships)

111.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

112.    The NCAA and NCAA member institutions by and through their officers, directors, employees, agents or other representatives have entered into an unlawful agreement combination and conspiracy in restraint of trade.  Specifically, the NCAA and NCAA member institutions have unlawfully agreed to artificially fix or reduce the amount of Division I football scholarships to be awarded to class members in exchange for the student-athletes' labor by agreeing among themselves to artificially limit the overall supply of Division I football scholarships.  These unlawful agreements have unreasonably restrained price competition among NCAA member institutions for student-athletes' labor.

113.    Class members seeking to provide their athletic labor in exchange for in-kind benefits, including grants-in-aid, have been deprived of the benefits of free and open price competition.

114.    Class members' choice of which NCAA Division I member institution to attend has been artificially restricted by the NCAA's restrictions on the number of Division I football scholarships.

115.    Defendant and its member institutions have undertaken this conduct in the United States and its territories.

116.     Defendant's business activities and operations involve and affect the interstate movement of students and the interstate flow of substantial funds (including, but not limited to, tuition, room and board, and mandatory fees).

117.     As a direct result of the conduct of Defendant and its co-conspirators, Class members have been injured.  Price competition among NCAA member institutions has been unreasonably restrained, and as a result Class members have been injured because they are paying or have paid substantially more for tuition than they would in a competitive market.

118.     The conduct of the NCAA is continuing and will continue to impose antitrust injury on student-athletes unless injunctive relief is granted.

119.     In addition, injunctive relief is necessary to remedy the effects of the NCAA's past wrongful conduct.

## SECOND CAUSE OF ACTION

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

### (Applicable to Plaintiff's Claims Regarding the NCAA's Transfer Rules)

120.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

121.     The NCAA and NCAA member institutions by and through their officers, directors, employees, agents or other representatives have entered into an unlawful agreement, combination and conspiracy in restraint of trade.  Specifically, the NCAA and NCAA member institutions have unlawfully agreed to restrain the ability of NCAA Division I football players to transfer to other Division I football schools without loss of athletics eligibility.  These unlawful agreements have unreasonably restrained competition among NCAA member institutions for student-athletes' labor.

122.     Class members seeking to provide their athletic labor in exchange for in-kind benefits, including grants-in-aid, have been deprived of the benefits of free and open competition.

123.     Class members' choice of which NCAA Division I member institution to attend has been artificially restricted by the NCAA's restrictions on their ability to transfer without loss of athletics eligibility.

124.     Defendant and its member institutions have undertaken this conduct in the United States and its territories.

125.     Defendant's business activities and operations involve and affect the interstate movement of students and the interstate flow of substantial funds (including, but not limited to, tuition, room and board, and mandatory fees).

126.     As a direct result of the conduct of Defendant and its co-conspirators, Class members have been injured.  Competition among NCAA member institutions has been unreasonably restrained, and as a result Class members have been injured because their choices of schools to attend have been limited.

127.     The conduct of the NCAA is continuing and will continue to impose antitrust injury on student-athletes unless injunctive relief is granted.

128.     In addition, injunctive relief is necessary to remedy the effects of the NCAA's past wrongful conduct.

**PRAYER FOR RELIEF**

129.     WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

       A.      Certification of the action as a Class Action pursuant to the Federal Rules of Civil Procedure, and appointment of Plaintiff as the Class Representative and his counsel of record as Class Counsel;

       B.      A declaration by this Court that Defendant's conduct constituted a conspiracy and that Defendant is liable for the conduct of or damage inflicted by any other co-conspirator;

       C.      A declaration that the NCAA's restrictions on the number of athletic-based scholarships that can be offered to student-athletes are also unlawful;

       D.      A declaration that the NCAA's restrictions on players' ability to transfer without loss of athletic eligibility are also unlawful;

       E.      Actual damages, trebled damages, punitive damages, and such other relief as provided by the statutes cited herein;

       F.      Pre-judgment and post-judgment interest on such monetary relief;

       G.      Equitable relief requiring NCAA member institutions to offer multi-year Division I football scholarships to remedy their past wrongful conduct, and enjoining Defendant from artificially reducing the total supply of scholarships available to NCAA student-athletes, and enjoining Defendant from restricting players' ability to transfer without loss of athletic eligibility;

       H.      The costs of bringing this suit, including reasonable attorneys' fees; and

       I.      All other relief to which Plaintiff and class members may be entitled at law or in equity.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues triable of right by jury.

RESPECTFULLY SUBMITTED this 8th day of March, 2016

By  */s/ William N. Riley*

William N. Riley (#14941-49)
Joseph N. Williams (#25874-49)
RILEY WILLIAMS & PIATT LLC
Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone:  (317) 633-5270
Facsimile:  (317) 426-3348
wriley@rwp-law.com
jwilliams@rwp-law.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
(*Pro Hac Vice* to be filed)

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4960
Facsimile:  (708) 628-4950
beth@hbsslaw.com
(*Pro Hac Vice* to be filed)

Jon T. King
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jonk@hbsslaw.com
(*Pro Hac Vice* to be filed)

Stuart M. Paynter
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, D.C.  20005
Telephone: (202) 626-4486
Facsimile:  (866) 734-0622
stuart@smplegal.com
(*Pro Hac Vice* to be filed)

*Attorneys for Plaintiff*